IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STEVEN T. STEIN and JOLEEN K. STEIN,

Plaintiffs,

vs.                                      Case No. 04-1311-JTM

GREGORY L. STEIN, SHARON W. STEIN,
MERIDIAN TOWN CENTER LLC,
MERIDIAN PLACE, LLC and PL WEST,
LLC,

Defendants.

## MEMORANDUM AND ORDER

This matter comes before the court on the defendants' Motion for Summary Judgment
(Dkt. No. 101), defendants' Motion for Reconsideration (Dkt. No. 108), and plaintiffs' Motion to
overrule objection to pre-trial order and/or to amend pleadings (Dkt. No. 112).  After reviewing
the briefs, the court grants defendants' Motion for Summary Judgment and denies the remaining
motions as moot.

## I. FINDINGS OF FACT

Plaintiff Steve Stein (age 54) and defendant Greg Stein (age 52) are natural brothers.  For
most of his working life, Steve has been a career banker in Kansas.  Since 1995, Greg has been a
real estate developer in the Seattle, Washington area.

### A. Prior Real Estate Developments in Washington

By the beginning of year 2000, Greg had already done several real estate developments in

Seattle, two of which -- 120 Aloha Associates LLC (hereafter "Aloha") and 2840 Madison Street Associates LLC, both Washington limited liability companies (hereafter "LLC") -- Steve and his wife Joleen participated in as investors. On Aloha, the two couples were accompanied by Sharon's brother, Lindsey Woolf, and his wife, Amy. None of the capital contributed in Aloha was returned to the "investors" until after the completion of the development and sale of the units.

There was another project prior to 2000, the 1005 Fifth Avenue Project, which Steve and Joleen declined to participate in because they felt it too risky. There was also a project, the "Timber Deal," which Steve and Joleen declined to participate in as equity investors but agreed to loan Greg money for use. On the projects in which plaintiffs were involved as equity investors, which included Aloha, the relationship of the parties was defined in a written LLC operating agreement. On the projects for which plaintiffs were lenders, as in the case of the Timber Deal, there were no promissory notes, no security agreements, no collateral pledged, no terms specifically negotiated and no basic documentation of any kind. In fact, there has never been any documentation for a loan from Steve to Greg.

**B. Meridian Town Center Development**

In January 2000, Greg, through his development entity, Western Front Development, Inc., (hereafter "WFDI") signed a purchase agreement for the purchase of a partially-begun shopping center development in the State of Washington known as Meridian Town Center (hereafter "MTC"). He believed the purchase to be a good opportunity because a recent appraisal on the project valued the land at $9 million whereas he could acquire it under the purchase agreement for under $6 million, and there were safety nets in the form of offers that existed to purchase

2

portions of the land.  The project as it then existed had numerous liens, had been a failure with prior development efforts by others, and had many issues to be overcome prior to a successful development.

Because of the opportunity, Greg invited his brother, Steve, to participate in MTC.  Steve visited Seattle and the site of the development, and talked to people familiar with the project.  He declined to invest with Greg.  The parties disagree as to the exact reasons why.

The parties at this juncture dispute what factually happened next.  After Steve and Joleen declined to be equity investors, Greg contends that he offered to personally guarantee the return of plaintiffs' money, if Steve and Joleen would be lenders.  Plaintiffs agree that Greg offered to guarantee their money but contend their role was nevertheless as equity investors.  Greg contends that Steve agreed in February or March 2000 for himself and Joleen to be a lender of a portion of the funds necessary to acquire the land; plaintiffs, on the other hand, deny they were ever lenders and claim they were "equity investors" from the outset.  Plaintiffs claim they based their decision to invest on a "proposal" received from Greg on April 7, 2000, which they believe were the terms and conditions of the agreement under which plaintiffs would be equity investors in the MTC project and allow their net worth to be utilized to obtain the loans to purchase the real property where MTC was located.  Plaintiffs claim that in early May 2000 they accepted the written offer outlined in the April 7, 2000 fax and attachment.

## C. The "Written Contract"

Plaintiffs assert that Greg sent them a fax on April 7, 2000, denominated "Investor Proposal" which contained all of the terms essential to an agreement and that they accepted the proposal thereby forming a binding, enforceable "written contract."  However, while plaintiffs

3

assert in this lawsuit that the relationship in this case is based upon a written contract, in their recent deposition they acknowledged that part of the "agreement" was oral and part contained in the written April 7, 2000 "proposal."  Plaintiffs, however, contend that the oral portion is not inconsistent or different in any manner than those terms of the written April 7, 2000 agreement. Steve has testified that he reversed his earlier decision not to get involved and "accepted" this April 7, 2000 "proposal" upon receipt of it; Joleen Stein testified that she "accepted" the proposal to be an "equity investor" on May 4, 2000.

**D. $1.4 Million Wired to Seattle**

Plaintiffs borrowed $1.4 million from Bank of Tescott, Salina, Kansas and the funds were wired to the defendants on May 4, 2000.  The land transaction closed on May 9, 2000.  Of that $1.4 million, $425,000 of it was returned to plaintiffs by Greg on May 9, 2000 -- five days later -- because the money was not needed to close on the land acquisition.  The bulk of the purchase price came from a loan defendant PL West, LLC (hereafter "PL West") obtained from Washington Capital in the amount of $5 million.

**E. Accrual of Plaintiffs' Cause of Action**

Regardless of any other conflicting factual assertions, it is undisputed that Steve and Greg had a face-to-face meeting a year later in Steve's office in Salina, Kansas, in mid-May, 2001 where the brothers had a heated argument.

At a minimum, Steve has testified that at the May 2001 meeting, the argument was precisely over whether Steve and Joleen were lenders or equity investors and the issue that has led to this lawsuit was fully joined.  Greg asserted unequivocally that plaintiffs were lenders only; Steve asserted they were equity investors.  Plaintiff contends that in a December 18, 2002

email Greg acknowledged Steve's interest as equity investors stating in an email "Relative to Steve's interest in the development, we have yet to finalize his participation/receivable. Tax returns that have been filed do not indicate he has an ownership position, however, you can be assured he has no liability or involvement other than the note at the Bank of Tescott that we have been discussing." Dkt. No. 109, Exhibit H, at p. 59. Also in a July 19, 2003 email Greg sent to Steve, Greg noted that Steve wanted to formalize his interest in the deal but Greg advised, "[o]n several occasions when you have indicated we needed to formalize your interest in the deal, I have asked you to provide a draft of what you are looking for." Dkt. No. 109, Exhibit 5, at pp. 1-2.

Steve testified that they left the meeting with these opposite positions. And, those positions haven't changed. Plaintiffs also note that there is no written communication prior to May 1, 2001, in which Greg indicated that plaintiffs' position is anything but that of an equity owner.

It is undisputed when Steve and Greg had their heated exchange in May 2001, Steve gave Greg an ultimatum: "I told him if that's your interpretation of where we're at and what's going to happen, then I was calling the loan. I want to be paid off immediately. If he intended us to be lenders, we had never negotiated any terms, any maturity date, nothing had ever been talked about a loan to that point in time. If that was the position he was going to take, then I said go find another lender and pay us off."

Plaintiffs have testified that the $1.4 million they "invested" in the project was entirely a "capital contribution" and that it would be left in the project as needed by Greg. Plaintiffs expected their money to be left in the project "until the investment was either sold out or, you

know, completed and there was a return on the capital."

**F. Repayment of $1.4 Million with Interest**

After the May 2001 argument between the brothers, Greg Stein made interest and principal payments on the loan defendants contend plaintiffs made to PL West. The entire loan – principal and interest alike – was completely retired in March 2004. However, plaintiffs contend that defendant PL West actually made payments on the $5 million loan to Washington Capital and ultimately refinanced that loan and made payments to pay off the $1.4 million loan from the Bank of Tescott.

Plaintiffs' alleged "capital contribution" was thus completely repaid, together with over $200,000 in total interest, even though plaintiffs concede in their testimony there was no provision in the alleged oral or written "agreement" for the repayment of capital or the payment of interest on a capital contribution. Plaintiffs further allege that the loan from Washington Capital went into default and was ultimately renewed approximately 13 months after it went into default, and plaintiffs were not released from their personal guarantees on the Washington Capital note until that note was paid off on November 25, 2002. Plaintiffs allege that the $1.4 million loan to the Bank of Tescott was not paid off until March 2004.

At the time the defendants' loan was made, plaintiffs and defendants signed personal guarantees for the Washington Capital loan. Plaintiffs contend that the parties were not co-equal in their personal guarantees as Washington Capital would not have made the $5 million loan without the express involvement and personal guarantee by plaintiffs. By November 2002, that loan was paid off and plaintiffs were released from their personal guaranty.

After May 2001, plaintiffs focused on trying to get their loan paid off by defendants.

6

Greg's expectation to re-pay the plaintiffs' loan much sooner than he was able to was thwarted by the economic effect of the terrorist events of September 11, 2001, and the onerous actions of a difficult anchor tenant. Plaintiffs contest this arguing that plaintiffs were trying to get an LLC agreement as the parties originally agreed.

**G. Plaintiffs Commence Lawsuit**

Plaintiffs filed their complaint on September 20, 2004.  In their amended complaint, plaintiffs asserted the following claims: 1) breach of contract; 2) fraud; 3) unjust enrichment; 4) breach of duty of good faith and fair dealing; 5) breach of fiduciary duties 6) punitive damages; and 7) accounting.

Plaintiffs submitted approximately 27 pages of "additional statements of uncontroverted facts" in their response.  However, the court does not find these facts material or necessary in determining the legal issues before this court.

**II. STANDARD OF REVIEW**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party.  Jurasek v. Utah State Hosp., 158 F.3d 506, 510 (10th Cir. 1998).  The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  Baker v. Board of Regents, 991 F.2d 628, 630 (10th Cir. 1993).  The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance.  Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1323

(10th Cir. 1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in Matsushita). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

## III. ANALYSIS

### A. Breach of Contract Claim

To fall within Kansas' five year statute of limitations for an action on written contract, the agreement, contract or promise must contain all material terms in writing. K.S.A. § 60-511(1). Turner and Boisseau, Inc. v. Nationwide Mut. Ins. Co., 944 F. Supp. 842, 846 (D. Kan. 1996) (citing Zenda Grain & Supply Co. v. Farmland Indus., Inc., 20 Kan.App.2d 728, 894 P.2d 881, 893 (1995); Chilson v. Capital Bank, 10 Kan.App.2d 111, 692 P.2d 406, 408 (1984), aff'd, 237 Kan. 442, 701 P.2d 903 (1985)). A contract which is partly in writing and partly oral is in legal effect an oral contract. Id. (citing Chilson, 692 P.2d at 408). Kansas law limits the statute of limitations for oral contracts to three years. K.S.A. § 60-512(1). Similarly, where a writing is dependent upon implied promises which are not express provisions of the written agreement, the three-year statute of limitations controls a cause of action based on the agreement. Turner, 944 F. Supp at 846 (citing Zenda, 894 P.2d at 893-94).

8

The central issue on which this action is predicated is whether all the material terms of the contract are in the written agreement.  The court finds that it is not.  In support of their claim of a written agreement, plaintiffs repeatedly refer to an April 7, 2000 fax from Greg to Steve. The document entitled "Meridian Town Center Investor Proposal."  By its very terms, the fax does not constitute an agreement.  The only comments on the sheet state:

> See attached proposal and proforma. As we discussed earlier, the initial proposal to the investors was a 2/3 developer - 1/3 investor split deal with the land being left in at full value for the developer and the investors receiving a priority return of equity. The attached structure represents a 50/50 split for the 10 acre parcel.

Dkt. No. 42, Exhibits 9, at pp. 68-69; Exhibit 10, pp. 1-7.  As it is titled, the document is merely a "proposal."  There is no signature, no statement on what is required to accept the proposal, and no indication of who the investors may be, besides what may be construed from the "To" and "From" line.  Plaintiffs argue that the contract at issue "provided that in exchange for plaintiffs' providing their personal guarantees and pledging their net worth to secure loans from both Kansas and Washington lenders, plaintiffs were to receive a 50 percent ownership interest in PL West, LLC."  Dkt. No. 109, at p. 39.  However, the agreement does not state that plaintiffs were to provide their personal guarantees or pledge their net worth.   As such, even based on plaintiffs' account of events, the court does not find that all the material terms are in the writing for a claim of breach of written contract.  As later events indicate, there was never truly a meeting of the minds as to each parties' obligations.

If plaintiffs were acting in reliance on this fax when they helped secure financing, then some part of the agreement must have been oral because there is no indication of how they would have to assent to the agreement.  Consequently, the contract should be construed as partly written

and partly oral.  Thus, Kansas law dictates that the contract should be construed as oral for the

purposes of the statute of limitations.  Since plaintiffs commenced this action on September 20,

2004, and the parties entered into an agreement in early 2000, more than three years has lapsed.

Thus, the statute of limitations bars plaintiffs' claim of breach of contract.

Plaintiffs attempt to salvage their delayed claim by arguing that there was written

acknowledgment that removes the statute of limitations.  Plaintiffs claim that there were "several

instances" where defendants acknowledged the equity ownership.  However, the court finds that

these alleged instances only undermine plaintiffs' argument.  Rather than demonstrate that there

was any agreement, they emphasize how there was never a meeting of the minds on the material

terms for a contract, thus supporting the court's holding that the April 7, 2000 fax does not even

constitute a written agreement.

Therefore, under a claim of breach of written contract, the court finds that the essential

terms have not been reduced to writing.  As for the claim of breach of oral contract, using

plaintiffs' alleged date of assent to the partly written and partly oral contract of April or May

2000, the court finds that plaintiffs have filed outside the statute of limitations.  Further, the court

finds that there was no meeting of the minds as to any partly written, partly oral contract.

Because of these findings, the court dismisses plaintiffs' claims of breach of good faith and fair

dealing and unjust enrichment as they rely on the existence of a contract, whether written or oral.

The court notes that while plaintiffs argue that they did not directly receive the benefit of

$200,000 in interest for their loan to Greg, defendants represent that the Bank of Tescott received

this payment.  The court accepts this representation and that plaintiffs are the beneficiaries of the

interest payment.  Thus, there is no claim of unjust enrichment even if the transaction is

10

considered purely a loan.

**B. Fraud Claim**

To establish an action for fraud, a party must show:  1) an untrue statement of material existing fact; 2) known to be untrue by the party making it; 3) made with the intent to deceive or with reckless disregard for the truth; 4) upon which another party justifiably relies and acts; and 5) to his or her detriment.  Alires v. McGehee, 277 Kan. 398, 403, 85 P.3d 1191 (2004).  Fraud must be established by clear and convincing evidence.  Alires, 277 Kan. at 403.  Kansas law provides that an action for relief on the grounds of fraud is barred if not brought within two years after the fraud is actually discovered or, with reasonable diligence, could have been discovered.  K.S.A. § 60-513(a)(3).  Waite v. Adler, 239 Kan. 1, 6, 716 P.2d 524 (1986).  Based on the factual findings, plaintiffs discovered any alleged fraud by at least May 2001, which is more than two years after the initial discovery.

The record indicates that Greg did not consider Steve an equity interest owner in MTC based on several interactions.  In the email sent on January 4, 2001, Steve asked about the ownership split of PL West, and Greg responded with interest rates that could be paid to Steve.  In a subsequent meeting in May 2001, Steve and Greg had a stormy discussion in which Steve would have clearly become aware that he was not an equity investor.  Using this later date of May 2001, plaintiffs' claim would be time barred as this action was filed more than three and a half years after the discovery of the alleged fraud.

In response to the statute of limitations argument, plaintiffs refer the court again to its previous arguments about the claims being timely.  As already discussed, the court finds that plaintiffs' arguments merely support the finding that there was no meeting of the minds as to the

written agreement.  The court does not find the July 19, 2003 email persuasive.  Greg's email stating "I have asked you to provide a draft of what you are looking for" does not prove or disprove the existence of an equity interest and read in context makes clear that he considers Steve's interest to be that of a lender.  Plaintiffs' argument that it was not until March 2004 that defendants refused them ownership interest in PL West is also unpersuasive.  This seems contrary to three years of history where Steve and Joleen's equity investor status appeared to be questioned by themselves, the defendants, the bank and plaintiffs' accountant.  Under these circumstances, the court finds that May 2001, at the latest, began the running of the statute of limitations.  It is more than a year after plaintiffs accepted the April 7, 2000 fax proposal, which they believed made them equity investors.  Even if the court adds the period of equitable tolling as defendants outline in their reply, this action is still time barred.  Based on the plaintiffs' discovery of the fraud in May 2001 and the equitable tolling, if applied, plaintiffs' claim is now time barred.

**C. Breach of Fiduciary Duty**

There are two types of fiduciary relationships:  1) those specifically created by contract such as principal and agent, attorney and client, and trustee and cestui que trust, for example, and those created by formal legal proceedings, such as guardian and/or conservator and ward, and executor or administrator of an estate, among others; and 2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions.  Olson v. Harshman, 233 Kan. 1055, 1058, 668 P.2d 147 (1983).  A fiduciary relationship may exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and

with due regard to the interest of the one reposing the confidence.  Id. at 1059.  However, there

must not only be confidence of one in another, but there must also exist a certain inequality,

dependence, weakness of age, mental strength, business intelligence, knowledge of the facts

involved, or other conditions, giving to one an advantage over the other.  Id.  A cause of action

for breach of fiduciary duty must be brought within two years of the accrual of the cause of

action.  K.S.A. § 60-513(a)(4).

At the outset, the court is not clear whether there is any actual fiduciary duty that was

breached.  The court has already found that there is no written contract, and there was no meeting

of the minds as to any partly written, partly oral contract.  Since defendants assert that they have

paid $200,000 in interest on the transaction they believed to be a loan, the only issue is whether

there is an implied in law duty.  Clearly, both parties to this transaction have had considerable

experience in financial matters, so there is no issue of inequity.  There may, however, have been

an issue about knowledge of the facts involved.  Plaintiffs allege that they had not received

information about the transaction as it was developing, including other litigation.  While the

court does not question these assertions, the court does question whether the statute of limitations

has run as to this claim.  Much as with the claim of fraud, the court finds that plaintiffs should

have been aware of the breach of fiduciary duty at least by May 2001, when there was a question

as to Steve and Joleen's interest in PL West.  Plaintiffs list a series of alleged breaches; however,

they have not provided any information as to the date of these breaches in their arguments

section.  Thus, the court accepts defendants' representation of the alleged breach and finds that

the statute of limitations bars the claim.

Even if the court were to find that the statute of limitations had not run, the fact that

defendants, believing that plaintiffs were lenders, paid $200,000 in interest undercuts a claim of breach of fiduciary duty.

**D. Remaining Claims**

With no viable claim of breach of contract, fraud or breach of fiduciary duties that survives the statute of limitations, plaintiffs have no basis for punitive damages or an accounting. In the absence of a basis for awarding actual damages, a claim for punitive damages must also fail.  McConwell v. FMG of Kansas City, Inc., 18 Kan. App. 2d 839, 860, 861 P.2d 830 (1993). A claim for accounting is remedial and should be dismissed if there is no basis for giving an accounting.

The court discourages the parties from filing a motion to reconsider.  If, however, the parties believe one is necessary, such motion should comply with the standards set forth by the Tenth Circuit and shall not exceed ten double-spaced pages. The response shall not exceed ten double-spaced pages.  No reply shall be permitted.

IT IS ACCORDINGLY ORDERED this 11th day of October 2005, that the court grants defendants' Motion for Summary Judgment (Dkt. No. 101).

IT IS FURTHER ORDERED that the court denies as moot defendants' Motion for Reconsideration and plaintiffs' Motion to Overrule Objections (Dkt. Nos. 108, 112).

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

14